# Snyder, Appellant, *v.* Corn Exchange National Bank.

*Banks and banking—Checks—Forgery—"Fictitious person"—Act of May 16, 1901, P. L. 194.*

Where a business firm gives to a clerk a power of attorney to draw checks against its account, and there is nothing in the power of attorney to limit the purpose for which the checks may be drawn, or to prohibit the checks from being drawn to bearer, and the clerk draws a check to a person having no business relations whatever with the firm, and forges the name of such person as indorser, and the bank pays the checks, the depositing firm cannot recover the amount of the checks from the bank. The payee of the check is a fictitious person within the meaning of the Act of May 16, 1901, P. L. 194. It is, therefore, a check made payable to bearer, and the forgery of the payee's name has no bearing in the transaction as affecting the bank's liability.

In such a case the fact that the clerk delivered the checks to the proprietors of a "bucket shop" in connection with a gambling transaction, is immaterial; and it is also immaterial that a trust company

in which the checks had been deposited for collection guaranteed the signatures of their depositors, inasmuch as the checks when delivered to the brokers were in contemplation of law checks to bearer, and the guaranty was limited only to the indorsement of the brokers.

The rule that a bank is liable to its depositor for paying a check on a forged indorsement, applies where a check has been lost or stolen and the payee's name has afterwards been forged; but it does not protect a depositor who is in fault, as in intrusting a check to one who he has reason to suppose will make a fraudulent use of it, or in so carelessly filling up a check that it may readily be altered, or in issuing a check to a fictitious person. It is confined to cases in which the depositor has done nothing to increase the risk of the bank.

Argued Jan. 14, 1908. Appeal, No. 325, Jan. T., 1907, by plaintiff, from order of C. P. No. 4, Phila. Co., June T., 1906, No. 5,012, discharging rule for judgment for want of a sufficient affidavit of defense in case of George E. Snyder, Individually, and trading as Harrison, Snyder & Son, v. Corn Exchange National Bank. Before MITCHELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Assumpsit to recover the amount of checks alleged to have been wrongfully paid by a bank.

The averments of the statement of claim and the affidavit of defense are set forth in the opinion of the Supreme Court.

The court discharged the rule for judgment for want of a sufficient affidavit of defense.

*Error assigned* was the order of the court.

*William S. Divine*, with him *George S. Graham*, for appellant.—The Corn Exchange Bank, defendant herein, can recover from the Real Estate Title Insurance and Trust Company or the banks of the clearing house which collected the proceeds of the forged indorsements, upon the facts of the case as stated in the affidavit of defense: Corn Exchange National Bank v. National Bank of the Republic, 78 Pa. 233 ; Tradesmen's National Bank v. Third National Bank of Pittsburg, 66 Pa. 435.

The averment in the affidavit of defense that the checks were regularly deposited and paid in the usual course of business, is no defense: Corn Exchange Nat. Bank v. Nat. Bank of the Republic, 78 Pa. 233.

The plaintiff, as a depositor in the defendant bank, is entitled to recover back money deducted from his account and paid out upon forged indorsements: Chambers v. Union Nat. Bank, 78 Pa. 205 ; Robb v. Pennsylvania Co., 3 Pa. Superior Ct. 254.

The affidavit of defense is insufficient to prevent judgment, because there is nothing in the power of attorney expressed or to be implied from the circumstances authorizing the forged indorsement of Charles Niemann's name, or authorizing the bank to pay on it.

The checks having been given in gambling transactions for an illegal consideration, are void, even if in the hands of an innocent holder for value under the act of April 22, 1794, 3 Sm. L. 177 ; P. & L. Dig. 2203 : Harper v. Young, 112 Pa. 419 ; Unger v. Boas, 13 Pa. 601 ; Brua's Appeal, 55 Pa. 294–298 ; Comly v. Hillegass, 94 Pa. 132 ; Durr v. Barclay, 8 Pa. C. C. Rep. 285.

*John Cromwell Bell*, with him *H. Gordon McCouch*, for appellee.—Where a depositor draws a check upon his bank payable to the order of a person who has no interest and is not intended to have any interest in the check or its proceeds, the check is in law payable to the order of a fictitious person.

Where a check is drawn and issued payable to the order of a fictitious person with the knowledge of the person making it so payable, the check is in law payable to bearer, and by paying the check to bearer the bank's duty to depositor is discharged.

A bank, in paying its depositor's checks, does not assume the risk of the genuineness or forgery of the indorsement of the name of a fictitious payee thereon : United Security Life Ins. & Trust Co. v. Central Nat. Bank, 185 Pa. 586 ; Land Title & Trust Co. v. Bank, 196 Pa. 230 ; Bank of England v. Vagliano, L. R. Appeal Cases (1891) 107 ; Phillips v. Mercantile National Bank of New York, 140 N. Y. 556 (35 N. E. Repr. 982) ; Coggill v. American Exchange Bank, 1 N. Y. 113.

OPINION BY MR. JUSTICE BROWN, June 2, 1908 :

In determining whether the rule for judgment for want of a sufficient affidavit of defense was properly discharged by the

court below, the following material averments in plaintiff's statement must be first considered: George E. Snyder, the plaintiff, trading and doing business as a broker in the city of Philadelphia, under the name of Harrison, Snyder & Son, was a depositor with the Corn Exchange National Bank, the defendant. He had in his employ a clerk named Edwin S. Greenfield, who was authorized to draw checks in his name against his deposit in the said bank for the special purposes stated in written power of attorney, lodged with the bank. This power of attorney was as follows: "Know All Men By These Presents, That we, Harrison, Snyder & Son, do make, constitute, and appoint Edwin S. Greenfield, our true and lawful attorney for us and in our name.

"1. To draw checks against our account in the Corn Exchange National Bank.

"2. To indorse notes, checks, drafts, or bills of exchange which may require indorsement for deposit as cash or for collection in said bank.

"3. To indorse any paper we may offer said bank, for discount.

"4. To accept all drafts or bills of exchange which may be drawn upon.

"5. To make substitution in collateral loans, and to do all lawful acts requisite for effecting these premises; hereby ratifying and confirming all that the said attorney shall do therein by virtue of these presents:

"In witness whereof, we have hereunto set our hand and seal, this 19th day of February, in the year of our Lord, one thousand nine hundred and two (1902).

"HARRISON, SNYDER & SON.
"Signed, sealed and delivered in the
    presence of
.   " C. MEYER, JR."

Against plaintiff's deposit with the defendant Greenfield, as attorney aforesaid, drew four checks payable to the order of Charles Niemann, amounting in the aggregate to $18,387.50. The first, for $6,000, was drawn on April 18, 1906; the second, for $1,800, on April 27, 1906; the third, for $2,587.50, on May 1, 1906, and the fourth, for $8,000, on May 3, 1906.

These checks were paid by the bank and charged to the account of the plaintiff. They purported to have been endorsed by the said Charles Niemann, but the indorsements of his name were forgeries and were never authorized by him or the plaintiff. The said checks purported to have been indorsed in blank by said forged indorsements to the firm of R. M. Miner & Company, a copartnership, purporting to carry on a stock and grain brokerage business, based upon actual purchases, sales and deliveries, but actually conducting a gambling establishment, popularly known as a " bucket shop." The said four checks were deposited by the said R. M. Miner & Company with the Real Estate Title Insurance and Trust Company, of Philadelphia, which acted as a bank of deposit for the said R. M. Miner & Company. The said trust company indorsed three of the said checks, guaranteeing the previous indorsements, to certain banks in the city of Philadelphia for collection, through which they were collected. The fourth check was also indorsed by the said trust company, but without guaranteeing the previous indorsements. The defendant, the Corn Exchange National Bank, replying upon the guaranty by the Real Estate Title Insurance and Trust Company of the indorsements upon the three checks, and upon its indorsement of the fourth, paid each of said checks, to it, through its collecting agents.

Upon the averments that the indorsements purporting to be those of Charles Niemann were forgeries, that the Real Estate Title Insurance and Trust Company collected the proceeds of the checks with actual knowledge of the character of the business of the firm of R. M. Miner & Company, that the defendant had constructive notice of the business of said firm, and that the said checks were not given in due course of business, the plaintiff claims to recover from the appellee the amounts it paid on them.

Turning to the affidavit of defense we find the following averred by the defendant : The plaintiff had in his employ as his confidential clerk and manager, Edwin S. Greenfield, to whom he largely intrusted the conduct and management of his business, particularly that portion of it relating to the finances, and the said clerk or manager had, by virtue of the power of attorney of February 19, 1902, drawn many checks upon the defendant, amounting in the aggregate to many

thousand dollars, which checks had been paid by the defendant on presentation and no payment had ever been questioned by the plaintiff. Greenfield after having drawn to the order of Niemann the *four checks* set forth in plaintiff's statement, delivered them to R. M. Miner & Company in the regular course of business, in payment of accounts due to the said firm. R. M. Miner & Company, after indorsing the said checks, deposited them with the Real Estate Title Insurance and Trust Company in the regular course of business, and the same were paid to the said trust company through the agencies set forth in plaintiff's statement. At the time each of the checks was drawn by Greenfield there were no business transactions pending between the plaintiff and Charles Niemann, and there were not due to him the amounts of said checks or any other sum or sums of money whatever. When Greenfield drew the said checks and forthwith delivered them to R. M. Miner & Company, he intended to cheat and defraud the plaintiff to the extent of $18,387.50 by having the checks paid to the said firm. He intended to write, and actually did write, the name of the said Charles Niemann on the back of the said checks in order to induce R. M. Miner & Company, and all others to whom they might be presented, to accept them as if they had been issued by the plaintiff to the said Charles Niemann in the regular course of business and had been indorsed by him, the payee named in them. When Greenfield, as attorney for the plaintiff, drew the checks to the order of Niemann, he well knew that the latter had no right to them, or any of them, and it was never intended by Greenfield that Niemann should receive them or the proceeds thereof. Niemann was not a real, bona fide payee, but was, in legal contemplation, a fictitious person, a fact well known to Greenfield at the time the checks were drawn. Said checks thereupon became payable to bearer, and the defendant is in no manner affected by the forged indorsements of Niemann's name thereon. Neither R. M. Miner & Company, the said the Real Estate Title Insurance and Trust Company, nor its collecting agents, had any notice or knowledge of any kind of the fraud of Greenfield until long after the checks had been paid by the defendant in due course in the regular order of business, and the said trust company had no knowledge of the character of the business of R. M.

Miner & Company as set forth in plaintiff's statement, if such was the fact, and that the checks represented gambling transactions.

It is to be noted that, though the averment in plaintiff's statement is that Greenfield was authorized to draw checks "for the special purposes" stated in the power of attorney, no special purposes are therein named. His authority to draw checks was a general and unlimited one, and upon the presentation of any check drawn by him as attorney for the appellant the bank was under no duty to ascertain the purpose for which it had been drawn. It was as safe in paying any check drawn by him as attorney for the plaintiff as it would have been if the check had been drawn by the plaintiff himself. By conferring this general power upon Greenfield the appellant made it possible for him to abuse it, and, having been abused by him, the principal now asks that another, the bank which innocently paid the checks, and not he, shall bear the consequences of the fraud of the agent whom he trusted. This result cannot follow unless in the face of the facts as set forth in the affidavit of defense, which for the present we must assume to be true, the appellee paid the checks and charged them to the appellant's account in disregard of a duty which it owed him.

Greenfield had admittedly been authorized to draw checks payable to bearer. A check so drawn and delivered by him to anyone could have been indorsed by the holder to another, and the payment of it by the bank to the indorsee could not have been questioned by the appellant. If, instead of drawing the four checks to the order of Niemann he had made them payable to bearer and gone to the bank and drawn the money himself, the appellant could not have repudiated the bank's payment to him ; or, if having made them payable to bearer he had delivered them to R. M. Miner & Co., and they had been indorsed by that firm to the Real Estate Title Insurance & Trust Company, and collected by it through the agencies set forth in plaintiff's statement, it would have been idle for the appellant to challenge the payments by the appellee in the face of his power of attorney clothing his clerk with unlimited power in drawing checks in his name and lodged by himself with the bank as its authority to pay any

checks drawn by virtue of it. Greenfield was responsible to his employer for the abuse of the power conferred upon him, and the employer's concern was that it should not be abused ; but it was never any concern of the bank why, or for what purpose, any check had been drawn by the clerk under the broad power given him by the employer. Its sole duty was to pay without question whenever a check so drawn was presented by the party to whom Greenfield intended it to be paid, and his intention every time he drew a check became, as to the bank upon which it was drawn, the intention of the man who had empowered him to draw it.

By our negotiable instruments Act of May 16, 1901, P. L. 194, a check is payable to bearer " when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable." The averment in the affidavit of defense is that Niemann was not a real, bona fide payee, but was in legal contemplation a fictitious person, such fact having been well known to Greenfield at the time he drew the checks ; that Niemann had no right to them, or any of them, and it never was intended by Greenfield that he should receive them or their proceeds. Niemann may have been an existing person, but he could have been, and was, a fictitious one within the meaning of the act of assembly if Greenfield intended to use his name, and did use it, as that of a person who should never receive the checks nor have any right to them. The intent of the drawer of the check, in inserting the name of a payee, is the sole test of whether the payee is a fictitious person, and the intent of the drawer of these checks as attorney for the appellant must, as just stated, be regarded as against the bank upon which they were drawn as the intent of the appellant himself. A fictitious person within the contemplation of the act of 1901 is not merely a non-existing one, for, if so, the word " non-existing " would have been sufficient without more. It is clear, then, that when the legislature declared that a check payable to a " fictitious or non-existing person " is to be regarded as payable to bearer, it meant a fictitious person to be one who, though named as payee in a check, has no right to it, or the proceeds of it, because the drawer of it so intended, and it, therefore, matters not whether the name of the payee used by

him be that of one living or dead, or of one who never existed.

In Bank of England v. Vagliano, L. R. Appeal Cases (1891), 107, the English bills of exchange act of 1882, after which our act of 1901 was modeled, was construed, and, in answering the contention that the word "fictitious" was only applicable to a creature of imagination, having no legal existence, Lord Herschell said : "If so, there was no necessity for the introduction of the word 'fictitious' in the enactment; the word 'non-existent' would have sufficed. . . . Where, then, the payee named is so named by way of pretense only without the intention that he shall be the person to receive payment, is it doing violence to language to say that the payee is a fictitious person ? I think not. I do not think that the word 'fictitious' is exclusively used to qualify that which has no real existence." Lord Morris, following, said : "I entirely agree in the conclusion arrived at by my noble and learned friend, Lord Herschell, viz. : that whenever the name inserted as that of the payee is inserted without any intention that payment shall only be made in comformity therewith, the payee becomes a fictitious person within the meaning of the bills of exchange act, 1882, section 7, sub-section 3, and that the bill may be treated by a legal holder as payable to bearer ; and, having had the advantage of reading the noble and learned lord's judgment in print, I concur in the reasoning by which that conclusion is arrived at." In this Lord Watson concurred, saying : "I think that the language of the sub-section taken in its ordinary significance imports that a bill may be treated as payable to bearer in all cases where the person designated as payee on the face of it is either non-existing, or, being in existence, has not, and never was intended to have, any right to its contents."

In Phillips v. Mercantile National Bank of New York, 140 N. Y. 556, a case singularly similar to the one now before us, the New York court of appeals, in construing the word "fictitious" in a statute of that state containing the same provision as ours, attached to it the same meaning as is given to it in Vagliano v. Bank of England. Bartlett, the cashier of the National Bank of Sumter, South Carolina, had authority from it to draw checks or drafts upon the Mercantile National Bank of New York, with which it had an account. He drew checks upon

that bank, making them payable to the order of existing persons, but without their knowledge, and then indorsed the checks in their names to a firm of stockbrokers in New York, who collected them from the Mercantile National Bank. The receiver of the Sumter bank brought suit against that bank to recover back the amounts which it had paid on Bartlett's checks, on the ground that the indorsements of the names of the payees were forgeries. It was held that there could be no recovery because the checks had been made payable to fictitious persons, even though the names adopted were those of known and existing ones, and were, therefore, to be regarded as having been made payable to bearer and intended for delivery to the stockbrokers in New York. This having been the intent of Bartlett, who had authority from his bank to draw the checks, his intent was said to have been, so far as the New York bank was concerned, the intent of his bank, and that whatever he did in drawing and delivering the checks was to be regarded as its act. In the course of its opinion the court said : " Whether indorsing the check in the name of the payee therein was a forgery in the legal sense, or not, is not the important question. In a general sense, of course, the cashier did forge the payee's name, but that fact did not affect the title or rights of the defendant: (Coggill v. American Exchange Bank, 1 N. Y. 113.) In the case cited, a bill was drawn upon the plaintiff to the order of one Truman Billings and was discounted at a bank. The drawer had indorsed it with the name of the payee, Truman Billings, a person who in fact had no interest in the bill. It was held that the defendant in the case, who had accepted and paid the bill, held it by a good title. Bronson, J., said : ' As the payee had no interest and it was not intended he should ever become a party to the transaction, he may be regarded, in relation to this matter, as a nonentity, and it is fully settled that when a man draws and puts into circulation a bill, which is payable to a fictitious person, the holder may declare and recover upon as a bill payable to bearer. In legal effect, though not in form, the bill is payable to bearer.' The case of Shipman v. Bank of the State of New York, 126 N. Y. 318, . . . . was a case wholly other than was made out here. It was stated in the Shipman case that the maker's intention is the controlling consideration, which determines

the character of the paper, and that the statutory rule which gives to paper drawn payable to the order of a fictitious person, and negotiated by the maker, the same validity as paper payable to bearer, applies only when such paper is put into circulation by the maker with knowledge that the name of the payee does not represent a real person. The principle of that decision is quite applicable to the case at bar. Though Bartlett selected, for the execution of his dishonest purposes, the names of persons who were dealers with his bank, it was, in legal effect, as though he had selected any names at random. The difference is, that by the methods resorted to, he averted suspicion on the part of the directors or other officers of his bank. The names he used were, for his purposes, fictitious, because he never intended that the paper should reach the persons whose names were upon them. The transaction was one solely for the fraudulent purpose of appropriating his bank's moneys by a trick which his position enabled him to perform. Concededly, if the names of the payees were of fictitious persons, the Sumter bank would have had no claim upon the defendant. . . . . The fictitiousness of the maker's direction to pay does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name. Where, as in this case, the intent of the act was, by the use of the names of some known persons, to throw directors and officers off their guard, such a use of names was merely an instrumentality or a means which the cashier adopted, in the execution of his purpose to defraud the bank, in an apparently legitimate exercise of his authority. The cashier, through his office, and the powers confided to him for exercise, was enabled to perpetrate a fraud upon his bank, which a greater vigilance of its officers might have earlier discovered, if it might not have prevented. If his position and the confidence reposed in him were such as to enable him to escape detection for the while, then the consequences of his fraudulent acts should fall upon the bank, whose directors, by their misplaced confidence, and gift of powers, made them possible, and not upon others, who, themselves acting innocently and in good faith, were warranted in believing the transaction to have been one coming within the cashier's powers. It may be quite true that the cashier was not

the agent of the bank to commit a forgery or any other fraud of such a nature, but he was authorized to draw or check upon the bank's funds. If he abused his authority and robbed his bank, it must suffer the loss. The distinction between such a case and the many other cases which the plaintiff's counsel cites from, is in the fact that it was within the scope of this cashier's powers to bind the bank by his checks. In transmitting them, made out and indorsed as they were, the bank was so far concluded by his acts as to be estopped from now denying their validity." If the checks drawn by Greenfield to the order of Niemann as a fictitious person had been drawn by Snyder himself with the same intent as Greenfield's, and he had indorsed Niemann's name on them and handed them to R. M. Miner & Co., it would not be pretended that he would have any claim against the appellee. And yet this is the real situation, for when Snyder lodged with the bank his power of attorney to Greenfield, he in effect said to it: "Any check drawn upon you by Greenfield as my attorney and issued by him is to be paid by you as having been drawn and issued by me." If this is not sufficient to protect the bank from liability for what the appellant now charges were its mispayments out of his funds, it is not easy to conceive what would be.

The guaranty of the previous indorsements on the checks by The Real Estate Title Insurance and Trust Company was a guaranty of the indorsement of R. M. Miner & Co., for it was the only one upon the checks in legal contemplation when they were deposited with the trust company. When the checks were delivered to R. M. Miner & Co. they were, as shown, payable to bearer, and nothing, therefore, need be said of the contention of the appellant as to the liability of the trust company to the appellee upon the guaranty of the indorsements on the checks unless it be to repeat what we have said through our Brother FELL in recognizing the liability of a bank to its depositor for payment of a check on a forged indorsement: "The rule applies where a check has been lost or stolen and the payee's name has afterwards been forged; but it does not protect a depositor who is in fault, as in intrusting a check to one who he has reason to suppose will make a fraudulent use of it, or in so carelessly filling up a check that it may readily be altered, or in issuing a check to a fictitious

person. It is confined to cases in which the depositor has done nothing to increase the risk of the bank:" Land Title & Trust Company v. Northwestern National Bank, 196 Pa. 230. The allegation that the checks were delivered to R. M. Miner & Co. in connection with gambling or wagering transactions is unavailing, in view of the averments in the affidavit of defense: Bank v. Arnold, 187 Pa. 356.

The assignment of error is overruled and the order of the court discharging the rule for judgment is affirmed.