HARTFORD ACCIDENT & IND CO v
FIRST NATIONAL BANK

Ohio Appeals, 1st Dist, Hamilton Co

Decided Jan 24, 1938

Robert A. Black, Cincinnati, for appellee.
Ernst, Cassatt & Cottle, Cincinnati, for appellant.

**OPINION**

By MATTHEWS, J.

This is an appeal on questions of law from a judgment of the Common Pleas Court of Hamilton County.

The relief sought was the recovery of money only. At the trial a jury was waived and the cause submitted to the court upon an agreed statement of facts.

The court found on the issues of fact in favor of the plaintiff and rendered judgment for it. It is from that judgment that this appeal was taken. As the decision turns largely on the facts, a rather full statement is deemed advisable.

The plaintiff alleged in its petition, in substance, that it had agreed to indemnify the Phoenix Insurance Company against loss on account of forgery, and the Phoenix Indemnity Company had agreed that the plaintiff should be subrogated to all rights accruing to it by reason of loss sustained by such forgeries; that on October 25, 1935, it paid to the Phoenix Indemnity Company $1,994.45 by reason of loss sustained by it through forgeries, as endorsers, of the names of the payees of certain drafts drawn by the Phoenix Indemnity Company upon itself, which drafts the defendant indorsed and presented for payment, representing that the endorsements were genuine and that the Phoenix Indemnity Company believing such endorsements to be genuine paid the amounts thereof which defendant received for the use and benefit of the Phoenix Indemnity Company.

The plaintiff also alleged that after the Phoenix Indemnity Company discovered the forgeries it paid the amounts of the drafts to the respective payees, and, the plaintiff having paid the Phoenix Indemnity Company, it transferred and assigned to the plaintiff all its rights against the defendant by reason of its endorsements upon said drafts, and its receipt of the money from the Phoenix Indemnity Company and also all right of subrogation accruing to the Phoenix Indemnity Company by reason of having paid the several payees.

In addition to these general allegations, there was set forth in the petition separate causes of action on each draft in which the circumstances of the issuance of each was set forth. These will be referred to in connection with the answer.

The plaintiff set forth in its petition the endorsements upon these drafts by the de-

fendant, which were as follows: "Pay to the order of any bank, banker or trust company. Prior endorsements guaranteed. January 17, 1935. First National Bank, Cincinnati, Ohio, A. R. Lughty, cashier."

The plaintiff also alleged demand for payment from and refusal to pay by, the defendant.

The defendant by its answer admitted that it forwarded the drafts through regular banking channels to New York City, where they were made payable, that it received the amount thereof and each of said drafts were endorsed by it as alleged by the plaintiff, that the Phoenix Indemnity Company had notified it of the forgeries and demanded payment and that it refused and continues to refuse payment. It denied that it had represented that the signatures of the payees as endorsers were genuine and that it had received any money for the use and benefit of the Phoenix Indemnity Company. There were other denials, but in view of the agreed statements of facts they are immaterial.

In answer to the allegations relating to each draft the defendant admitted that the Phoenix Indemnity Company had authorized and directed Harry Neal Smith, its agent and attorney, to execute drafts payable to the named payees, that said Smith did draw the drafts in the name of the Phoenix Indemnity Company, as drawer, by himself, as attorney upon the Phoenix Indemnity Company, as drawee, that said drafts contained a recital that when properly endorsed, each was to be a release in full of the described claim of the payee against its policy holder, that Harry Neal Smith did not deliver the drafts to the respective payees, but transferred and delivered them to the defendant with the names of the respective payees written on the reverse side, but which were not signatures of said payees, that the defendant then endorsed the drafts as alleged and forwarded them for payment. The defendant denied that it made any representation or guarantee and that the plaintiff had any claim against it by reason of its receipt of the money from the Phoenix Indemnity Company.

The answer affirmatively alleged that Harry Neal Smith was the agent and attorney of the Phoenix Indemnity Company with authority to sign and execute the drafts, and he signed and executed them as agent and attorney of said company and that at no time intended to deliver them to the persons whose names were written therein as payees or intended that such persons should have any interest therein, but used such names for his own convenience and thereby made said drafts payable to fictitious persons, that the defendant in good faith and without any notice or knowledge of any alleged infirmity in said drafts or alleged defect in the title of the person negotiating the same, and in consideration of the sums for which drafts were drawn, acquired good title and had the right to receive payment thereof.

The answer further alleged that in compliance with the requirement of the Phoenix Indemnity Company, its agent Smith forwarded to it letters of advice and other documents, informing it that said drafts were being drawn and purporting to state circumstances but which did not state the truth, and that the Phoenix Indemnity Company was negligent in relying upon the information furnished it by the said Smith, and also that it was negligent in other respects.

While the petition and answer contain slight differences of allegations as to the circumstances of the issuing of the various drafts, it is believed that such differences are immaterial. The defendant upon these allegations asserted the legal conclusions that the Phoenix Indemnity Company was estopped from denying that the defendant's title to the drafts was a good title and to assert a right to recover the money paid to it on them.

On the admissions the plaintiff stands in the position of the Phoenix Indemnity Company as drawer and ██ drawee of these drafts and is also entitled to assert whatever rights the persons named as payees had against the defendant.

It is admitted that Harry Neal Smith was and had been the attorney of the Phoenix Indemnity Company ██ for many years in the investigation of claims against its policy holders and in settlement of such claims as authorized in each instance, that he was investigating claims asserted by the persons whose names he inserted as payees in these drafts, and had purported to keep his principal advised of the progress of negotiations and it had authorized a settlement of all except one of these claims for designated maximum amounts, and the drawing of the drafts for that purpose. Smith had not truthfully reported to his principal and the claimants had not agreed to accept the exact amounts reported by Smith, as having been agreed upon. The Phoenix Indemnity Company had furnished forms of drafts upon it to be used in mak-

ing the statements. These drafts were designed to be made payable to the persons whose claims had been settled, and when the blanks were filled in, described with considerable particularity the payees, and when endorsed by such persons would operate by their express terms as releases.

It is stipulated that Smith had no intention at any time to deliver these drafts to the persons who had claims against the Phoenix Indemnity Company's policy holders and whose names he had inserted as payees, and that they should at any time have any interest in said drafts.

After preparing the drafts and lulling his principal into anticipating the presentation for payment of drafts payable in the settlement of actual claims, Smith signed the names of the payees across the backs of the drafts and obtained the money on them from the defendant. He was a depositor of the defendant bank at the time.

That, in substance, is the case presented by this record.

While the instrumentalities used by Smith were negotiable, this action is not one based upon the law peculiar to such instruments.

It is an action based upon the assertion that the plaintiff paid the money under a mistake of fact, and that the defendant received it from the plaintiff under such circumstances that in equity and good conscience it cannot retain and, therefore, the law implies a promise to repay it. It is true that the plaintiff also asserts liability upon the endorsements as contracts under the Negotiable Instruments Act, but we are of the opinion that such contracts (disregarding for the time being the terms of express warranty endorsed thereon) did not, under that act, include a warranty of the genuineness of the payees' signatures as endorsers. Undoubtedly, in view of the criminal law, these signatures were forgeries, and undoubtedly as between Smith and his principal, the latter, upon discovery could so denounce them. But as between the drawer-drawee of these drafts, the knowledge, intent, and purposes of its agent in drawing them must be imputed to it. By §8114, GC, it is provided that:

"The instrument is payable to bearer * * * when it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable."

There were persons having the names of these payees, but Smith never intended the drafts for them. Their names were chosen solely because they fitted into his plan to deceive and defraud his principal. Under such circumstances, had these been drafts of the usual form it could be claimed upon formidable authority that they were fictitious so far as transferees of the drafts without knowledge were concerned. Phillips v Mercantile Nat'l Bank, 140 N. Y. 556, 35 NE 982; Bartlett v First Nat'l Bank, 247 Ill. 499, 93 NE 337; Mueller et v Liberty Insurance Co., 187 Ky. 44, 218 SW 465; U. S. Cold Storage Co. v Central Mfg. District Bank, (343 Ill. 503, 175 NE 825) 74 A.L.R. 811. However, this case does not require a decision upon that point.

Further reference to the law peculiar to negotiable instruments would not be helpful in reaching a conclusion in this case.

The plaintiff also contends that the endorsement "all prior endorsements guaranteed" constitutes an express contract upon which the defendant is liable. It is not necessary to pass upon this contention in order to reach a decision between the parties.

It should be said here that no one has contended that Smith had authority from his principal to endorse the names of payees. It would make it a party to a forgery. Also signing the payee's names, he did not pretend to act for them. The representation was that they had acted for themselves. And in his dealing with the defendant he acted for himself as owner of the drafts and not on behalf of any one else. There can, therefore, be no question of ratification of his acts by the payees, or the Phoenix Indemnity Company. None is claimed.

Three cases recently decided by this court are relied upon as having some remembrance to this case: **Central Trust Co. v Eureka Security Fire & Marine Ins. Co., 50 Oh Ap 308, 3 O.O. 393, (19 Abs 557) Central Trust Co. v Backsman, Id. 512, and State Planters Bank & Trust Co. v Fifth-Third Union Trust Co., 9 O.O. 297 (56 Oh Ap 309; 24 Abs 300).**

Central Trust Co. v Eureka Security F. & M. In. Co., supra, was an action by the drawer-drawee of a draft, whose unfaithful agent had used the draft as a means of completing a fraudulent plan. The distinction between it and the case at bar rests in the fact that the fraud had its inception in a transaction anterior to the preparation of the draft. The same agents had previously induced the drawer-drawee by fraudulent representations to issue an insurance policy. Then later they pretended that a liability had been incurred on this policy and the draft was drawn in payment of this os-

tensible loss to the person named in the policy as the insured. The draft was, therefore, payable to the person actually intended by both the principal and the agent, the only difference being that the former's intention had been induced by this antecedent fraud. There was just one transaction involved; that one being the fraudulent insurance policy, whereas in the case at bar there were two transactions, the genuine claims against the policy holders and the fictitious ones conceived by the agent. The principal had in mind the genuine ones and the agent the fictitious ones. The money paid on the draft of the Central Trust Co. v Eureka Security F. & M. Ins. Co. went to the policy holder actually intended by the drawer-drawee, albeit that intention was superinduced by the fraud of the agent. The money in the case at bar never reached the actual person intended by the drawer-drawee. It reached that other person—the real person, Smith, concealed behind the fictitious designation. The distinction between the two cases clearly appears from the statement in the opinion at page 313:

"The policy was issued to Clarence Brooks. True he did not exist, or if he ever did. he had disappeared, and his name was used for the purpose of fraud. The proof of claim and loss was filed by Clarence Brooks. The draft was made payable to Clarence Brooks. Unless the use of a fictitious name is a forgery, forgery did not exist in this case. E. P. Tally was the real party, but he used in all the proceeding the name of 'Clarence Brooks'. It would therefore appear that the draft was regular. * * *"

There was also the other defense of laches in that case.

The case of Central Trust Co. v Backsman, supra, is readily distinguishable. The recovery was by the payee for the conversion of her property, to-wit: the check. The action in this case is by the drawer-drawee, whose relation to the drafts was that of primary debtor. It would be a complete confusion of thought to consider a debt property for which the debtor could recover upon any theory.

In State Planters' Bank & Trust Co. v Fifth-Third Union Trust Co., supra, the plaintiff was the drawer-drawee, and the issues bear a strong resemblance to those in the case at bar. There was in that case, however, no general guarantee of all prior endorsements as there is in this case, and

there were no unusual recitals in the drafts under consideration in that case. This court, after pointing out that the name written across the back of a negotiable instrument by a person presenting it for payment, was in no proper sense an endorsement, held, that the issue between the prayer and the recipient of the money must be determined upon equitable principles, and if the circumstances show that to permit the recipient to retain the money would cause an unjust enrichment, the court should compel restitution to the payer. So far as the general principle of substantive law is concerned, it is not perceived that there is any difference between that case and this. The chief difference results from the manner of trial and the disposition of the case in the trial court. In that case a jury was not waived, and the court instructed a verdict for the plaintiff. In the case at bar, a jury was waived, and the court found for the plaintiff. In the former case, this court reversed the judgment and remanded the cause for a new trial, solely because the court erred in instructing a verdict for the plaintiff, instead of submitting the issue to the jury as there was substantial evidence of negligence on the part of the plaintiff tending to prove that it would be inequitable for it to recover the money paid by it on the draft. As the jury was waived, and the trial court found generally for the plaintiff, if there is substantial evidence of facts and circumstances found in the agreed statement of facts from which the court could reasonably draw the conclusion that it was inequitable for the defendant to retain its money, we cannot disturb its findings.

There is substantial evidence that the defendant was negligent. The unusual recitals would or might attract attention of a reasonably prudent person. They describe the claims that would be satisfied by the payments and prominently recited that "when properly endorsed on the back hereof, this draft becomes and constitutes a release in full." At the bottom was the statement that "this draft must be indorsed in ink and deposited for collection within ten days." On the reverse side was printed in large type "this draft must be endorsed by payee personally and such endorsement shall constitute a receipt in full on account shown on reverse side. Make all endorsements below." And with all these recitals before it, and with the payees thus identified, the defendant forwarded the drafts with the endorsements thereon guaranteeing all prior endorsements.

Now these drafts were presented by Smith, whose name appeared as drawer-drawee agent. He was a depositor of the defendant and, of course, known to its officers. The payees appeared to have endorsed these drafts. If so, what right had Smith with them? His possession would be anomalous no matter what the wording of the drafts and particularly so of drafts phrased as these were. True, he was the agent in the drawing of these drafts, but under ordinary circumstances neither he nor his principal would have possession of them after they had been endorsed by the payees. Such possession required explanation under these circumstances, but none was demanded.

Would a reasonably prudent banker under such circumstances accept such drafts and pay the amounts to the agent? Was the defendant negligent in that respect? Should it have endorsed its guarantee upon them under the legend showing that the drawee insisted upon the personal endorsement of the payee? And was the plaintiff justified in paying, believing that the payee had endorsed them, and did the defendant contribute to that belief by its conduct? All these were questions to be considered by the trier of the facts in reaching a conclusion upon the issue of whether the defendant would be unjustly enriched by the retention of this money paid to it.

It does not seem to us a sufficient answer to all this to say that within the meaning of the Negotiable Instruments Code the drafts were payable to fictitious payees, even assuming such to be the legal effect of what was done.

Gruner & Bros. Lumber Co. v First Nat. Bank et, 109 So. 274, 143 Miss. 454, is similar to this case in that the person guilty of the fraud was in some respects the agent of the plaintiff and the defendant had endorsed a guarantee of all prior endorsements upon the draft. The court held, as stated in the syllabus:

"1. Where bank purchases draft endorsed by drawer, and bearing ostensible payee's acknowledgment of its receipt in payment for lumber, which proved to be a forgery, and bank guarantees all prior endorsements, bank is liable to drawee for money paid thereon.

"2. Where agent is employed to buy lumber, with authority to draw draft endorsed by seller for percentage of purchase money, and without authority to draw draft otherwise, persons dealing with agent are charge-

able with notice of extent and scope of agency.

"3. Where bank purchased draft, and guarantees all prior endorsements which included endorsements of drawer and forged endorsement of payee, and offers it for collection, it cannot complain of failure to give notice of forgery promptly on discovery thereof, being bound by its contract of guarantee, and chargeable with notice of facts."

In First Nat. Bank of Winnsboro et v First Nat. Bank of Quitman, Tex. et, 299 SW (Tex.) 856, the court, at 857, said:

"Each complaining bank put upon the check, or checks, handled by it, this notation, 'all prior endorsements guaranteed.' This meant and was intended to mean a guaranty of the genuineness of the endorsement by payees named in the checks. Without an endorsement purporting to be that of the payees, as is manifest, none of these banks would have come into possession of the checks, and the loss would not have occurred. Acceptance of the forged endorsements and putting it in circulation with a guaranty of integrity (Johnston v Schnabaum, 86 Ark. 82, 109 SW 1163, 17 L.R.A. (N.S.) 838, 15 Ann. Cas. 876) obviously contributed, if it did not cause final payment, and this of itself certainly with the aid of other matters discussed by the Court of Civil Appeals, is sufficient to entitle the drawee bank to relief. Rouvant v San Antonio Nat. Bank, 63 Tex. 610."

As already stated, the court found generally for the plaintiff, and we must presume that all these factors were considered and decided adversely to the defendant. While the court's opinion is no part of the authentic record, upon which the validity of its ruling must be determined, it is gratifying to read in its opinion that "it is likewise true that Smith was a depositor of the defendant bank, and by reason of that fact defendant failed to exercise that caution and care which a bank should exercise in determining whether the signature of the payee of the draft was genuine or otherwise before placing its endorsement upon the draft guaranteeing all prior endorsements," thereby disclosing that the presumption accords with actuality.

For these reasons, the judgment is affirmed.

ROSS, PJ, and HAMILTON, J, concur.